Michael Harnden, Esq.
2954 N. Campbell Ave.
#340
Tucson, AZ 85719 AZ Bar No. 029474
Phone: (520) 329-5309
mikeharndenlaw@gmail.com

**In The United States District Court**
**For The District Of Arizona**

| | |
|---|---|
| Slep-Tone Entertainment Corporation, | Case No.: 2:13-cv-885-ROS |
| Plaintiff | |
| vs. | **Response to Defendant's Motion to Dismiss 1st Amended Complaint** |
| U.R. Entertainment Inc., et al., | |
| Defendants | Hon. Silver |

The Plaintiff, Slep-Tone Entertainment Corporation ("Slep-Tone"), by its counsel, hereby responds in opposition to the motion (Doc. 30) of Defendant UR Entertainment, Inc. ("UR") to dismiss the First Amended Complaint (Doc. 28).

UR's "kitchen-sink" memorandum seeks to shift the focus from Slep-Tone's plainly pled trademark infringement and unfair competition claims by distracting the Court with irrelevant and misleading side issues.[1] The First Amended Complaint constitutes a detailed set of factual allegations narrowly drawn to yet completely asserting Slep-Tone's claims against UR.

///
///
///

---

[1] For example, UR notes that Slep-Tone has sued many defendants in venues across the United States on these claims. In fact, Slep-Tone has sued more than 1,000 such defendants, but that figure reflects only that Slep-Tone's products are extremely widely counterfeited. UR apparently seeks to escape liability on a "safety in numbers" defense, on the theory that a suit is somehow less legitimate if there are many similar suits against similarly situated defendants. That "defense" raises the question: If UR were only one of a handful of defendants Slep-Tone had sued, would it consider the claims to be more legitimate? It seems unlikely.

1

## I. LEGAL STANDARD

To survive scrutiny under Rule 12(b)(6), a complaint must plead enough facts to state a claim to relief that is plausible on its face. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim "has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). The factual allegations must present enough detail "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

Factual allegations, however, must be assumed by the Court to be true, for purposes of Rule 12(b)(6). "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679.

## II. ARGUMENT

### A. The First Amended Complaint provides a sufficient factual basis for a plausible theory of trademark infringement and unfair competition.

In order to state a claim for trademark infringement or unfair competition based upon false designation of origin, a plaintiff must show (1) that the subject mark is a valid, protectable trademark (First Amended Complaint, ¶¶ 37-40) ; (2) that the plaintiff owns the subject mark (*id.*); and (3) the defendant used the mark, or a similar mark, in commerce, without consent, in a manner that is likely to cause confusion among ordinary consumers as to the source, sponsorship, affiliation, or approval of the goods (*id.*, ¶¶ 41-63). *See* 15 U.S.C. § 1114(1); *Brookfield Communications, Inc., v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1046–47 n. 8 (9th Cir. 1999); Ninth Circuit Manual of Model Civil Jury Instructions, § 15.5.

Stated more simply, the First Amended Complaint alleges that UR created or obtained physical products (computer files that play audiovisual content) that Slep-Tone <u>did not make</u>, but that are nonetheless marked with Slep-Tone's trademarks; that those physical products are similar to but inferior in quality in comparison to genuine products; and that UR used the fake products in commerce in connection with its karaoke business.

2

If this case were about sports apparel or designer purses, there would be no question as to the appropriateness of the claims. If UR were selling Arizona Diamondbacks jerseys or Louis Vuitton purses that it copied from the originals, without the permission of the trademark owners, it would not dare make the argument that it had the right to do so simply because the fake products were copied using the originals as templates. But because the fake products it has made or acquired and used are in the nature of audiovisual works, UR treats Slep-Tone's property as though it is not real, though Slep-Tone's trademarks—and all that they symbolize—are unimportant.

The Trademark Act says otherwise.

> (1) Any person who shall, without the consent of the registrant—
>
> (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or
>
> (b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive,
>
> shall be liable in a civil action by the registrant for the remedies hereinafter provided.

15 U.S.C. § 1114(1). Further:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

3

>   (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person,
>
>   […]
>
>   shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).

These provisions rightly focus the Court's attention on the *reproduction of the mark*; the *origin, sponsorship, and approval of the goods*; and the *likelihood of confusion, mistake, or deception created by the use*. Slep-Tone has alleged in the First Amended Complaint that UR is using a reproduction of the marks (¶¶ 43, 49); that the reproduced mark is being applied as a sort of label to a physical product someone else (either UR or its source), not Slep-Tone, made (¶¶ 46-48); that Slep-Tone did not approve of the reproduction of the mark or of the fake goods bearing the mark (¶ 51); that UR's use of these reproduced, and therefore fake, goods in its commercial business is a deceptive act and a false designation of the origin of the tracks UR is using (¶¶ 52-53, 55) that is likely to confuse its customers and patrons into believing, falsely, that Slep-Tone authorized this arrangement (¶ 58).

Likewise, the basis for Slep-Tone's claim for damage is laid out in the complaint. In sum, Slep-Tone has suffered because "UR's unlawful activities reduced the number of discs it needed to purchase to achieve an amount of use commensurate with the demand for karaoke services that it has sought to satisfy." (¶ 68.)

**B.    The Claims are not magically transformed to something else simply because they might have been pled differently.**

4

UR argues that Slep-Tone cannot have a claim for trademark infringement or unfair competition because the conduct UR engaged in[2] *might* be characterized as some other civil wrong. UR contends that these claims are more properly cast as copyright infringement or contract claims and that they therefore cannot also constitute trademark infringement.

The Supreme Court has made it clear that for purposes of the Trademark Act, it is <u>the physical thing</u>, not <u>the content embodied or symbolized in it</u>, that constitutes the "good" to which a trademark is applied. *See Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 37 (2003). In that case, Dastar had distributed copies of video in which copyright had been formerly owned by Twentieth Century Fox, but that had fallen into the public domain. Dastar marked the videos with its own trademarks, without any reference to Fox as the former producer and copyright owner. Fox asserted a false designation of origin claim, on the basis that it, not Dastar, was the origin of the video. The Court concluded:

> In sum, reading the phrase 'origin of goods' in the Lanham Act in accordance with the Act's common-law foundations (which were not designed to protect originality or creativity), and in light of the copyright and patent laws (which were), we conclude that the phrase refers to the producer of the tangible goods that are offered for sale, and not to the author of any idea, concept, or communication embodied in those goods.

*Id.*

Because Dastar made the copies, it was the origin of the goods, and the placement of its trademarks on the goods was <u>not</u> a false designation of origin even though Fox (formerly) owned the copyright in the content. Moreover, the Court noted probable Trademark Act liability if Dastar "had simply copied [the television series] … without changing the title or packaging (including the original credits to Fox)." *Id.* at 36. That is precisely the claim here.

---

[2] As noted *supra* Section I, the plausible factual allegations regarding UR's conduct must be accepted as true for purposes of determining whether a claim has been stated.

It may well be that Slep-Tone originated the *content* found in UR's fake goods, but the fact remains that Slep-Tone did not make the tracks itself, and that is what is important for trademark purposes.

UR also asserts that it is being sued primarily because it did not comply with Slep-Tone's Media-Shifting Policy (MSP)[3] in conducting its media-shifting activities. The existence of the MSP is a fact that is of interest in this action because it demonstrates that there is a method by which UR could have obtained permission to apply Slep-Tone's trademarks to non-original items, if it had cared to do so. The result of compliance with the MSP—which requires more than simply maintaining 1:1 correspondence between original discs and non-original tracks—is a "covenant not to sue," which is effectively, among other things, a license to use the trademarks in question, predicated upon quality controls through the inspection that forms one of the requirements of the MSP.

UR contends that its purchase of original CDs entitles it to come under the umbrella of the media-shifting policy, and that its failure to do so is simply a contractual or quasi-contractual matter. It also mistakenly contends that the First Amended Complaint concedes that it "lawfully acquired" original discs.[4] If UR desires to assert as an affirmative defense, for example, that it was entitled to a license based upon substantial compliance with the MSP, it is welcome to plead that as an affirmative defense. *See* Fed. R. Civ. P. 8(c)(1) (identifying "license" as an affirmative defense). It will likely find that field tough to plow because, as the First Amended Complaint alleges, it has satisfied *none* of the requirements of the MSP.

---

[3] UR refers at multiple places in its argument to Slep-Tone's "MSM" policy. The source of that abbreviation is unknown, but presumably UR means "MSP."

[4] UR refers to paragraph 45, which states that "UR does not maintain a 1:1 correspondence relationship between its hard drives and original discs it has lawfully acquired." That allegation does not concede that UR has lawfully acquired any discs; it suggests instead that even if UR has lawfully acquired any discs, it nonetheless does not maintain 1:1 correspondence with them. Paragraph 67 expressly refers to "tracks that UR never obtained in any original form."

Nevertheless, the existence of a potential license defense is not grounds for dismissal of the complaint, and UR cites no authority to the contrary.

### C.  UR's Rule 8 assertion is misplaced.

UR contends that the First Amended Complaint fails because it does not put UR on notice as to when the activities complained of commenced.  Although the implausibility of UR's lack of knowledge as to when it began its own activities as alleged might be turned aside for the moment, UR's Rule 8 argument is essentially a back-door invocation of Rule 9(f).

However, "Rule 9(f) does not have the effect of *requiring* allegations of time and place, but merely operates to make such allegations, *if made*, material for the purposes of testing the sufficiency of the pleadings as against, for example, a motion to dismiss." *Kuenzell v. United States*, 20 F.R.D. 96, 99 (N.D. Cal. 1957) (citation omitted) (emphasis in original). Allegations would become material and dismissal on motion for failure to state a claim would be appropriate only "[i]f the allegations of the complaint affirmatively show that the complaint is barred by the applicable statute of limitations." *Levy v. Paramount Pictures*, 104 F.Supp. 787, 788 (N.D. Cal. 1952).

It should likewise be noted that the obligations of Rule 8(a) extend to jurisdiction, the claim for relief, and the demand, not to anticipatory pleading of factual matter directed to potential affirmative defenses.  *See* Fed. R. Civ. P. 8(a), 8(c) (identifying, *inter alia*, "statute of limitations" and "laches" as affirmative defenses that must be pled responsively).

Perhaps most importantly of all, the Trademark Act does not contain a statute of limitations, and there is therefore no statute of limitations defense to trademark infringement. *See Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*, 603 F.3d 1133, 1140 (9th Cir. 2010). However, laches is an equitable defense that is available under the Trademark Act, and in considering laches, delay beyond the analogous state-law statutory period is presumptively unreasonable. *See id.*  The applicable Arizona statute is the fraud statute of limitations, which is three years.  *See id.*; Ariz. Rev. Stat. § 12-543(3).  The only allegation of time in the First

Amended Complaint is the allegation that the infringing activities were ongoing in January and February, 2012, a date that is squarely inside the applicable three-year period.

**D.     UR's assertion of nominative fair use is likewise misplaced.**

UR contends that it is entitled to dismissal on the basis of its supposed "nominative fair use" of Slep-Tone's trademarks. UR theorizes that because "the content and presentation of the Slep-Tone product to the public is unchanged" whether the source is an original disc or a computer file, the use of Slep-Tone's trademarks on UR's computer files is a "true and correct" designation of origin.

This theory runs strongly contrary both to the law regarding "origin" and to the factual allegations of the First Amended Complaint. First, as noted above, for purposes of the Trademark Act, <u>UR</u>, not Slep-Tone, is the origin of the computer-based tracks that UR uses. Thus, when UR uses Slep-Tone's marks on a product that UR created, that designation of origin is not "true and correct."

Second, Slep-Tone has alleged in the First Amended Complaint that the "content and presentation" of UR's product differs substantially from that which originates from an original disc. *See* First Amended Complaint, ¶ 19 ("between 60% and 90% of the data representative of and comprising the music component of the track is discarded in order to reduce the size of the resulting computer file"); and ¶ 20 (the computer-based track is "a lower-resolution imitation of the original karaoke accompaniment track").

Nominative fair use analysis applies when a defendant uses a plaintiff's trademark to "describe or identify the plaintiff's product, even if the defendant's ultimate goal is to describe or identify her or her own product." *Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 811 (9th Cir. 2003). UR contends that Slep-Tone has admitted that the mark was used to attribute tracks to Slep-Tone, referring to paragraphs 49-50 of the First Amended Complaint. But those paragraphs do not explicitly carry any such admission, and to infer one requires certain

stretches of the mind that have already been foreclosed as discussed above.  Furthermore, a later allegation puts the question to bed:

> UR's placement of the Sound Choice Marks upon UR's self-created computer files was intended not to attribute the content of the computer files to Slep-Tone's authorship or origin, but to pass off the computer files, falsely, as original materials made by Slep-Tone.

First Amended Complaint, ¶ 55.

UR's theory of nominative fair use borders on the ridiculous.  Under that theory, an accused counterfeiter of Louis Vuitton purses[5] would be able to defend himself on the basis that the use of the well-known LV mark on the counterfeits is intended to refer to the original he used as a pattern. The more assiduous the copying, the less likely the plaintiff would be to prevail.  Essentially, UR seeks to escape liability for acts that are easily identified as infringement when more tangible goods are involved, simply because the process by which its fake goods are made is easily and quickly accomplished using commonly owned computer equipment.

For that to be the rule would vitiate the whole of the Trademark Act; no act could ever be an infringement where a plaintiff's mark is used by a defendant, because the nominative fair use defense would always be in play.  Instead, nominative fair use protects the use of a mark to *describe* the goods of another.  This is not a situation in which UR is advertising that its tracks as an independent product are "as good as SOUND CHOICE" or even "copied from original SOUND CHOICE discs," which would at least present a colorable theory of nominative fair use.  UR is seeking to pass off its fake goods as the real thing.

---

[5] Louis Vuitton is used as an example because, like Slep-Tone, it is an often-enough victim of counterfeiters and pirates that it finds itself frequently before the courts as a trademark infringement plaintiff, especially in reported decisions.

### III. CONCLUSION

In view of all the foregoing, Slep-Tone respectfully submits that it has presented plausible claims for relief and urges the Court to deny UR's motion to dismiss.

RESPECTFULLY SUBMITTED this Thursday, January 30, 2014.

/s/ Michael Harnden

Attorney for Plaintiff

### Certificate Of Electronic Filing

I hereby certify that on January 30, 2014, a copy of the foregoing was electronically transmitted to the Clerk's office for filing using the CM/ECF System.

/s/ Michael Harnden

Counsel for Plaintiff